# SUPREME COURT OF TENNESSEE,

5L 1
9L 286

#### FOR THE

## EASTERN DIVISION.

### KNOXVILLE: SPECIAL MARCH TERM, 1880.

JULIUS E. RAHT *vs.* THE UNION CONSOLIDATED MIN-
ING COMPANY OF TENNESSEE.

1. CHANCERY PLEADINGS AND PRACTICE. *Bill to set aside contract for fraud. What it must alledge.* Where it is sought by a bill to set aside a contract or to obtain a general account upon a charge of fraud, it is not sufficient to make such a charge in general terms, but it should point out and state the particular acts of fraud.

2. PRINCIPAL AND AGENT. *Confidence and trust.* Equity attaches to the relation of principal and agent such confidence and trust as precludes the latter from doing any act or making any contract for his own benefit in regard to the subject-matter of the agency, but this principle is confined to matters falling within the scope and limits of the agency and to the property embraced in the trust, and does not apply, except under peculiar circumstances, to acts, contracts or property outside the trust.

3. SAME. *Same.* To the extent the parties modify the relation by special agreement, to the same extent is the confidence and trust which the law attaches to the relation, without limitation or restriction, enlarged or diminished.

1—VOL. 5.

Raht v. Mining Company.

4. SAME. *Same. Duty of agent to disclose.* The fact that such an advantage has been taken in a contract as a man of honor would refuse to take, will not warrant the court in setting aside a contract, but it must also be shown that there is some obligation to make a disclosure and this obligation does exist generally in the relation of principal and agent, and it is not enough for the agent to put the principal on enquiry, but must disclose such material facts as are unknown to the principal.

5. CHANCERY PLEADINGS AND PRACTICE. *Stated and settled accounts.* A stated and settled account cannot be opened to let in items omitted or to exclude items charged except upon grounds of fraud, mistake or manifest error, and in a bill for such purpose the particular acts of fraud or the specific mistake or error must be stated and pointed out.

6. PRINCIPAL AND AGENT. *Confidential relation.* The policy of the law is strongly against permitting certain classes of transactions to stand which have been entered into when confidential relationship exists between the parties without an inquiry, but this doctrine does not extend to a stated and settled account between principal and agent when there has been an actual accounting although there may have been confidence and trust, but the doctrine does extend to a stated and settled account between attorney and client.

7. SAME. *Same.* A principal may buy from the agent and the agent buy from the principal, and when it can be seen that they deal with each other at arm's length, that the agent does not conceal any fact within his knowledge important to the principal to know, and all the means of information are open to the principal, their dealings and transactions must stand upon the same footing as dealings and transactions between strangers.

8. SAME. *Same. Contracts.* The parties, in defining the nature and scope of the agency and fixing the character and amount of compensation for services, must be regarded as dealing with each other as strangers, and this is not only true as to the original contract, but true when the parties again renew the agency and fix the compensation, and the agent is not bound to disclose the true value of his services or of his compensation.

9. CHANCERY PLEADINGS AND PRACTICE. *Costs.* The general rule on the subject of costs adopted in courts of chancery is the same as in a court of law, that the costs follow the result of the suit, but the former may, under certain circumstances, excuse the successful party from the payment of costs to his opponent, and even in exceptional cases actually throw his own costs upon the party succeeding.

Raht v. Mining Company.

10. SAME. *Same.* It is a settled rule in courts of equity that a party introducing unfounded charges of fraud will be made to pay the costs occasioned thereby, though he may be successful in the suit or the other party may have acted in such a manner as to give reasonable grounds of suspicion.

FROM POLK.

Appeal from the Chancery Court at Benton.    W. F. COOPER, Ch., presiding by interchange.

A. S. COLYAR, P. B. MAYFIELD and S. P. GAUT for complainant.

JNO. L. T. SNEED and JOHN & W. M. BAXTER for defendant.

JORDAN STOKES, Sp. J., delivered the opinion of the court.

It is apparent from a careful examination of the record that the parties have spared no labor or pains in the preparation of the case in the inferior court. They have furnished us with a large mass of proof, both oral and documentary, upon all the issues in the pleadings, as well as a large amount which lies outside of any issue legitimately presented. The arguments of learned counsel on both sides have displayed great ability and legal learning and research, and have been full and exhaustive upon all the questions of law and fact. Nothing has been left undone by either the parties or their counsel which could aid the court in arriving at an accurate and satisfactory conclusion. We have given to the case as a whole and in detail the

consideration which its interest and magnitude seem to demand, and have, upon careful examination and deliberate reflection, arrived at a conclusion which meets with the unanimous approval of the court.

The issues presented in the pleadings involve the dealings and transactions between a large mining company and its general superintendent and agent, extending over a period of some seventeen years, and consisting of a vast number and variety of items. A brief history of the company and of the agency will be useful, if not essentially necessary, to a clear and complete understanding of the matters in litigation. We are furnished with ample and most reliable materials and facts for this brief history in the minutes of the company's board of directors and of the stockholders at their annual meetings, the correspondence between the superintendent and agent and the officers of the board, and the admissions and concessions of the parties.

It appears that defendant company was incorporated by an act of the Legislature of this State, passed on the 1st day of March, 1854, under the name of the "Union Consolidated Mining Company of Tennessee," for the purpose, as expressed in the charter, "of exploring and mining for copper and other ores and minerals, and for working, smelting, manufacturing and vending the same." The capital stock was not to be less than five hundred thousand dollars and was not to exceed five millions of dollars, based alone upon money or mineral property. It was incorporated with a view of consolidating a number of other mining

companies and properties into one corporate body. The incorporators held their first meeting under the act on the 23d January, 1858, in the county of Polk in this State, and organized the company by fixing the capital stock at the sum of two millions two hundred thousand dollars, electing a board of directors and accepting a subscription of stock in mining properties, valued at two millions and fifty thousand dollars. It does not appear that the residue of capital stock, being one hundred and fifty thousand dollars, was ever subscribed much less paid in.

A majority of the directors elect met on the 13th April, 1858, in the city of New York, and organized by the election of a president and other officers, and located the business office of the company and the place of its own meetings in that city, where it has continued to hold its meetings and transact the business of the company ever since. At the next meeting, the board directed the issuance and sale in the market of two hundred and fifty thousand dollars in shares of the capital stock, based on the mining properties already conveyed to the company, one half of the proceeds to be applied to the liquidation and extinguishment of prior liens on the property, and the other half to be used as a working capital to carry on the business of the company; but it does not appear that anything was realized for the latter purpose from this source. It is quite clear the mines were thought to be very valuable in the beginning, and promised to be much more so when they should be fully explored and developed. The stockholders and

directors, elected from year to year, seem to have entertained this opinion; but, for some reason not satisfactorily explained in the record, they did not display any disposition to embark their private means in the enterprise, not even to an amount sufficient to place the operations of the mines and works upon a safe and permanent basis. In consequence of the failure to provide a working capital, the directors were from time to time forced to resort to temporary loans and the use of mortgage bonds of the company; but, during most of the time, they engaged persons of great wealth and known credit to furnish the necessary capital, submitting to stipulations as to liens on the personal property, sales of the products of the mines and works and rate of interest on monthly balances, which were highly injurious alike to the operations and profits of the company's business.

On the 30th of June, 1858, the board appointed Samuel Congdon general agent of the company, giving him "the general superintendence of the business at the mines and of the transportation and sale of the products of the same," which position he held for something less than a year, and then left the mines and settled permanently in the city of New York. About the time Congdon was made general agent, complainant Raht was employed as superintendent of the mines, and upon Congdon's retirement was made general agent and superintendent of the company's mining and smelting operations, which position he continued to hold without interruption down to the beginning of the present litigation. In the month of July,

Raht v. Mining Company.

1866, the board engaged Jenneson Eager, one of its own members, as sales agent for the period of one year, he undertaking to furnish in money or raise by acceptances of the company's drafts the necessary working capital, and the board agreeing to allow him two and one-half per cent. on all sales of refined copper and five-eighths of one per cent. as brokerage, with interest at the rate of seven per cent. per annum on monthly balances in his favor.    Mr. Eager being disinclined to renew the contract of sales agency for another year, the president of the board wrote to complainant Raht on the subject and urged him to take the agency upon the same terms and conditions, with like compensation and interest, for the services, risks and advances of money.    With some hesitation Raht accepted the agency for one year, and entered into a written contract with the company embodying the terms and conditions of the agency and the compensation and rate of interest to be allowed the agent.    By way of security and indemnity, the board gave him a lien on the personal property of the company, including the ores taken from the mines and the products of the smelting and refining works, and admitting an existing indebtedness to him of $36,943.47. This contract of the sales agency was renewed, without material change or alteration, from year to year until the year 1873, the board adding in May, 1868, to the indemnity and security of the agent a lien on one hundred and fifty thousand dollars of the company's bonds secured by a first mortgage on its mines, works and other real estate.    In the month of Sep-

tember, 1873, Raht, by special agreement with the
board of directors, surrendered the sales agency, and
the board agreed to and did in fact pay him the sum
of twelve thousand dollars in commutation of his profits
for the unexpired term of the contract, which was to
extend to the end of the year 1874.

It is admitted that Raht made out and forwarded
to the board of directors during the whole period of
his superintendency and agency, excepting three years
during the civil war, monthly statements of his ac-
counts, showing with great minuteness of detail the
expenditures for labor, materials, hauling, etc., for the
preceding month. These statements gave every item
of expenditure, the names of the employees and the
amount paid to each, the number of bushels of char-
coal bought and the price paid for it per bushel, the
number of cords of wood bought, as well as the num-
ber of cords cut on the lands of the company, and
the price per cord paid in each instance, and the
amount and price paid per hundred pounds for hauling
from the mines and works to Cleveland and from
Cleveland back to the mines and works. No com-
plaint was ever made before the commencement of this
litigation that these statements were not sufficiently full
and minute in their detail of items. On the 8th of
July, 1872, the board appointed a committee from its
own members to examine the books and securities of
the company, and to suggest improvements, if any
were needed, in the mode of keeping the accounts.
This committee gave the subject of the mode and
manner of keeping and reporting the accounts a care-

Raht v. Mining Company.

ful and thorough examination, and made the single recommendation to the effect that the pay-rolls should, in addition to what appeared in them as previously kept and made out, "group the different classes of labor." It appears to have been the uniform custom of the board of directors to appoint a committee of its own members to examine into and report upon the correctness of these monthly statements soon after they came to hand, and to appoint a like committee to examine all the statements for the current fiscal year, in order to prepare the annual report of the board for the information and action of the stockholders at their annual meetings. Considering the immense number of items and the complication of the company's business, it is very remarkable that but one error was ever found in the monthly statements, and that one consisted in giving the company a wrong credit for several items, amounting to the sum of $636.28, which the committee discovered and corrected upon their examination. These monthly statements were not only subjected to careful examination as above stated, but were reported back to the board and approved as correct and satisfactory without dissent from any director, and were also in substance approved by the action of the stockholders at their yearly meetings.

It appears from the minutes of the board and from the admissions of the company in the pleadings, that numerous settlements were made with Raht as superintendent and agent, based upon the admitted correctness of the monthly statements, and that balances were ascertained and settled in the most solemn and bind-

ing manner.   Some time in June, 1860, the board declared a dividend of five per cent. on the capital stock, and the company became thereby embarrassed in meeting the monthly expenses at the mines.   In the month of January, 1861, Raht agreed, upon the earnest request of the board, to indorse drafts on the treasurer of the company, and in this way to raise the means of carrying on the business, and to indemnify and secure Raht on account of such indorsements, the board of directors gave him a lien on the company's personal property and on the ores and products of the mines and works.   Under this arrangement, the business of the company was carried on until the close of the war, communication with the board of directors being interrupted and regular operations at the mines being in some sort suspended for several years.   In the month of February, 1864, Raht succeeded in getting through the country to the city of New York with the books and accounts of the company's business and operations during the three preceding years, and had a full settlement with the board of directors, including the whole of that period.   It was ascertained and agreed upon the settlement that the company was indebted to Raht in the sum of $31,004.34, and this indebtedness was then paid in refined copper at the mines.

The parties seem to have made after this time annual settlements down to the beginning of this suit, in which balances were ascertained, agreed to and settled or secured by a lien on property.   On the 15th May, 1867, the board of directors admitted an in-

debtedness to Raht of $38,943.57, and gave a lien as before mentioned to secure its payment and the payment of future advances.    Upon the removal of the sales agency contract in May, 1868, the company, through the action of the board, agreed to pay on the 1st August, 1868, fifty thousand dollars of its existing indebtedness to Raht, and to pay on the 1st December, 1868, the balance, without mentioning the amount, and renewed the lien on the personal property, adding one hundred and fifty thousand dollars of its first mortgage bonds.    Another settlement was made on the 16th January, 1869, when it was ascertained and agreed that the company was indebted on the first day of that month the sum of $124,596.98, for which amount the company gave its notes to Raht, taking from him a receipt in the form which the board had prescribed beforehand.    In the settlement made on the 16th March, 1870, the indebtedness on the first day of that year was ascertained to be $58,927.99; and in the settlement made on the 1st June, 1872, Raht fell in debt to the company the sum of $1,253.10, which the board of directors declared in express terms "to be accepted as correct and a final basis for future settlements of his accounts as superintendent and sales agent." And upon the footing of the correctness and finality of this settlement Raht gave up the company's notes for the $124,596.98 and the first mortgage bonds.

It is conceded that the parties made their last settlement on the 1st December, 1874, when it was ascertained and agreed that the company was on the 31st October, 1874, indebted to Raht in the sum of

$84,711.61, and to secure the payment of this indebtedness and subsequent advances, the board of directors gave a lien on the company's personal property, including the productions of the mines and works.    It was further stipulated between the parties that all the refined copper should be sent to New York for sale under the direction of certain officers of the board, and the proceeds of the sales should be paid over to Raht until the then existing indebtedness and the amount of subsequent advances should be satisfied in full.    A duly certified copy of the resolutions of the board, admitting the indebtedness of $84,711.61, stipulating for future advances and creating a lien, was forwarded to Raht, who had the same registered in the counties of Polk and Bradley in this State, where the mines and other property of the company were situated.    Raht continued to make advances and to forward monthly statements of his accounts, and the company continued to pay his drafts on the treasurer until some time in September, 1875, when the board declined to make any further payments, and in a few days afterwards the original bill was filed in this case.

It is quite certain the persons holding the position of directors during the period of Raht's agency, reposed great confidence and trust in his professional skill, business capacity, integrity and fidelity as a man, and gave most favorable consideration to his suggestions and recommendations about the management and improvement of the company's business and property; but we do not find that this confidence and trust induced them to neglect the proper discharge of their

duties, much less to give a blind or inconsiderate approval to his suggestions and recommendations.   It is equally certain that Raht was a man of strong and vigorous intellect, of wonderful business capacity and of great energy and activity in prosecuting the large and various enterprises in which he was all the time engaged.   Conceding his integrity and fidelity, such a man always will and deserves to have great weight and influence with his employers in all matters connected with the business committed to his management and control.

On the other side, the ·directors of the company appear to have been gentlemen of no ordinary business capacity and of considerable experience and training as merchants, bankers, brokers and large capitalists in the city of New York; and judging from their action as a board in managing the operations of a large mining company, they show no want of the necessary intelligence, capacity and good faith to discharge the important duties and responsibilities of their position. Many of them must have commanded · for a series of years the unbounded confidence of the stockholders. Charles B. Tatum, Samuel Congdon and James A. Alexander were members of the first board of directors and were continued in the position, the two former until the election in 1872 and the latter until the election in 1874.   John Thomas was elected a director and made president of the company in the year 1866, and held both positions, with a short intermission as president, until his resignation after the institution of this suit, having been elected in 1875 a director for the

full term of three years. Many other directors were continued in the position for many consecutive years, but not for so long a period as in the instances above mentioned. We are forced to the conclusion that the board of directors were at all times reasonably qualified to guard and protect the interests of the company, to examine into and understand fully the monthly statements of the superintendent and agent, and to weigh and decide upon the merits of his suggestions and recommendations.

It seems to have been a uniform thing for the president of the company and committees, composed of members of the board, to visit the mines and works at least once a year and some years oftener, for the purpose of looking carefully into the different departments of the company's business and its management. Men of high reputation for scientific attainments were now and then sent out to examine into the quantity and richness of the ores and the practical operations of the works for smelting and refining them. It is worthy of special notice that no officer or committee or scientific visitor ever expressed any objection or dissatisfaction as to Raht's management until the visit and report of Secretary Duval in the summer of 1875. Indeed Mr. Duval does not allege any mismanagement of either the mines or works on the part of Raht, but, in the main, complains of the board's allowing him to carry on a store and receive all the profits, being very large every year for the capital invested. It is difficult to determine what influence, if any, this report had in the subsequent action of the board, for

it purports to have been made on the 10th August, 1875, yet the board continued after that as before to pay Raht's drafts on the treasurer, and no mention is made of the report in the minutes of the board until the adoption of the resolution declining to pay any more drafts of the superintendent and agent.

On the 10th September, 1875, Raht filed an attachment bill against the company, alleging substantially the leading facts above detailed and the existence of an honest and just indebtedness from the company to him, amounting on the 31st August, 1875, to the sum of $108,789.34, and praying the attachment of the company's property, personal and real, the appointment of a receiver to take charge of the mines, works and other property pending the litigation, the enforcement of the lien of the 1st December, 1874, by a sale of the personal property and effects, and the subjecting of a sufficient quantity for the purpose of the real estate to satisfy the balance of the indebtedness. It is not deemed necessary to notice more particularly the allegations of the original bill, or to detail the various steps taken in the chancery court as to the receivership or other matters preliminary to the hearing on the merits.

On the 12th October, 1875, the company filed its answer as an answer and cross-bill under the provisions of the Code, and on the 30th October, 1875, it filed an amended answer, exceptions to the original answer having been filed and sustained in the mean time. The company admits most, if not all the material allegations of the original bill, but alleges that

Raht planned a deep-laid scheme of fraud and over-reaching and was engaged during the whole period of his agency in carrying this scheme into effect to the great detriment and loss of the company; that as a consequence of his success in this scheme, he became very wealthy at the expense of the company; that he was guilty of suppression and misrepresentation of important and material facts in obtaining sundry contracts from the board of directors, particularly the lien of the 1st December, 1874, upon the personal property of the company, and that he committed several gross breaches of confidence and trust and otherwise mismanaged the company's business and operations, from which it sustained heavy losses and injuries. Then follow what are claimed by way of cross-bill, to be specific charges of fraud, mistakes and errors in the statements and settlements of accounts between the parties; and as a plausible foundation for the allegations, the company asserts that Raht acquired by one means and another the unbounded confidence of its directors and possessed great influence, if not entire control, over their action in great as well as small matters. On the 18th September, 1876, the company  filed an amended cross-bill, in which, after repeating the general charges of fraud, overreaching, mismanagement and violation of confidence and trust, sundry other matters of profit and gain to Raht and loss and injury to the company are alleged and relied upon as grounds for relief.

Complainant Raht put in separate answers to the original and amended cross-bills, in each of which he

Raht *v.* Mining Company.

denies in positive terms all the allegations of fraud, overreaching, mistakes, mismanagement and breach of confidence and trust, and gives special explanations of the dealings and transactions between him and the company claimed to be erroneous, fraudulent and unconscionable, and pleads and relies upon the monthly statements and numerous settlements of account coming down to the filing of his bill, as a complete bar and defense against the relief sought by the original and amended cross-bills. He also pleads and relies upon the statute of limitations, but this defense is not seriously pressed in the argument of the counsel.

Upon the hearing of the cause in the chancery court, Chancellor Cooper dismissed the cross-bills and gave Raht the relief prayed for in the original bill, but taxed him with all the cost in that court; and from this decree the company has brought the case by appeal into this court.

It is not insisted in the argument of the learned counsel for the company, nor could it be with any hope of success, that the answer, outside of the matters alleged by way of cross-bill, interposes any valid defense to the relief sought by the original bill. It is certainly true that the answer abounds in allegations of fraud and overreaching on the part of Raht, and makes a positive statement to the effect that the resolutions of the board, admitting the indebtedness of $84,711.71, and creating the lien relied upon in the original bill, were obtained by the fraudulent suppression and misrepresentation of important and material facts; but these allegations are too general and in-

2—VOL. 5.

definite to allow proof to be introduced to sustain them, or otherwise to command the attention and interposition of a court of equity. It is the settled rule of law, that where a bill seeks to set aside a contract, or to obtain a general account upon a charge of fraud, it is not sufficient to make such charge in general terms, but it should point out and state the particular acts of fraud. Story's Eq. Pl., sec. 251; 1 Daniel's Ch. Pl. and Pr., 4 Am. ed., 324; *Fort* v. *Orndoff*, 7 Heis., 167; *Other* v. *Smurthwaite*, L. R., 5 Eq., 437. In the last cited case, Vice Chancellor Wood says: "So far from its being the principle that the defendant is to be allowed to be taken by surprise, and without any preparation is to be called upon to meet something which a witness may assert, nothing is more settled than the doctrine that where you charge fraud you must state the facts upon which you allege fraud and prove them strictly." And this rule of law applies in the present case wherever the company allege fraud, whatever may be the connection or purpose of the allegation.

Great emphasis in the pleadings and argument is placed upon the facts that Raht accumulated a large estate during his agency while the condition of the company was not materially improved, and that he acquired the unbounded confidence of the directors and exercised a controlling influence over them in all the business matters of the company. If it were shown that his agency for the company and his management of its mines and works were his only sources of profit and gain, then the fact of his amassing a large estate

Raht v. Mining Company.

would create some suspicions of his integrity and fidelity and awaken greater care and caution in looking into and determining his motives and purposes in his dealings and transactions with the company. But the force of this argument is greatly weakened, if not entirely overcome, by the concession that he was the owner of valuable mills, two productive farms, and two or more mines, was agent for other companies, and extensively engaged in the business of merchandizing and trade generally, from all which sources, his great activity, business talent and close economy enabled him to realize handsome profits. If the directors had reposed unbounded confidence in his integrity and fidelity and had followed without question or dissent his suggestions and recommendations, it could not, most certainly, be alleged against him as a fault; but the minutes of the board do not show any such blind confidence or implicit obedience to his advice. No doubt many things which Raht recommended and the board adopted, turned out in the end to be unprofitable to the company; but in view of the character of the company's enterprise and business and the frequent changes and improvements which experience, science and perfected skill were daily making, it would be most wonderful, if no mistake, miscalculations, no unwise and unprofitable alterations had been advised and adopted during the long period of the agency. We do not think either branch of the argument can be properly used to sustain the claim of the company or to disparage that of the agent Raht.

The real matters in litigation between the parties

arise out of and depend upon the allegations of the
company's cross-bills and the defenses interposed to the
same in the statements of Raht's answers.    The basis
of the company's claims for relief is to be found in
the doctrine of courts of equity applicable to the
confidential relation of principal and agent, and the
main defense rests upon the principles of law appli-
cable to the plea of stated and settled account.    Take
this relation out of the case and substitute in the
place thereof litigants dealing with each other at arm's
length, and all difficulty in disposing of the issue
would disappear at once.

It is certainly settled law that courts of equity
attach to the mere relation of principal and agent
such confidence and trust as precludes the latter from
doing any act or making any contract for his own
benefit in regard to the subject matter of the agency,
and gives to the former, if he desire it, the advantage
of all that the agent does about the trust-property.
1 Lead. Cas. in Eq., 4 Am. ed., top page 62.    As
will be seen, the principle is confined to the matters
falling within the scope and limit of the agency and
to the property in the trust, and does not apply, ex-
cept under peculiar circumstances, to acts, contracts or
property outside of the agency and trust.    To the
extent that the parties modify the relation by special
agreement, to the same extent is the confidence and
trust which the law attaches to the relation, without
limitation or restriction, enlarged or diminished; the
validity or invalidity of such agreements depending,
not upon the existence of the relation or its duties

Raht *v.* Mining Company.

and responsibilities, but upon the same circumstances and incidents which affect the making of contracts in general.

It will not do to say that "wherever such an advantage has been taken in the course of a contract by one party over another, as a man of delicacy would refuse to take, such a contract shall be set aside." After laying down this principle, and supposing the case of a purchase of an estate with a valuable mine on it, known to the purchaser and not to the owner, Lord Thurlow proceeds to say: "It is therefore not only necessary that great advantage should be taken in such a contract, and that such an advantage should arise from a superiority of skill or information, but it is also necessary to show some obligation binding the party to make such a disclosure. Therefore the question is not whether this transaction be such as a man of honor would disclaim and disdain, but it must fall within some settled definition of wrong recognized by this court; for, otherwise, the general transactions of mankind would be too much in hazard and uncertainty." *Fox* v. *Markreth,* 2 Cox, 320; 1 Lead. Cas. Eq., 4 Am. ed., top p. 205. And these principles were laid down in the case of a trustee, for sale for payment of debts, purchasing the property by taking an undue advantage of the confidence reposed in him as such trustee. It is certainly true that when this binding obligation to make a disclosure exists, as it generally does in the relation of principal and agent, it is not enough for the agent to put the principal upon inquiry, but must disclose such material facts as

are unknown to the principal and as will enable him to form a reasonably correct opinion and conclusion as to his best interest.

It is also well established that a stated and settled account cannot be opened to let in items omitted, or to exclude items charged, except upon the grounds of fraud, mistake or manifest error; and where a bill is filed for such a purpose, it is not sufficient to allege the fraud or mistake in general terms, but the particular acts of fraud or the specific mistakes or errors should be stated and pointed out. Story's Eq. Pl., sec. 251; *Mebane* v. *Mebane*, 1 Ired. Eq. Rep., 403; *Staughton* v. *Lynck*, 2 John. Ch. R., 217; *Leycraft* v. *Dempsey*, 15 Wend. R., 83; *Drew* v. *Power*, 1 Schoales & Lefroy, 192; *Pratt* v. *Weyman*, 1 McCord. Ch. R., 161; *Weed* v. *Small*, 7 Paige, 575; *Philips* v. *Belden*, 2 Edwards' Ch. R., 13, 14. In *Pratt* v. *Weyman* the court says: "When there is an error apparent on the face of the account, the court will not hesitate to relieve. The court, however, is not, generally speaking, inclined to unravel an old account, notwithstanding it may have been settled upon an erroneous principle. Nor will the court open a settlement where it has been signed, or a security taken on the footing of it, unless for fraud or errors distinctly specified in the bill and proved as specified." In *Drew* v. *Power*, Lord Redcsdale, after premising that the court should look a great deal more at the consequences as they may affect other parties than the parties in the particular cause, and laying down the general principle that a settlement of account will not be set aside un--

less the allegations and proof show the whole transaction to be iniquitous, proceeds: "If the account impeached be a settled account, or if an instrument has been executed on the foot of it, the court expects that the errors should be specified in the bill and proved as specified, otherwise it would be easy to overturn the fairest accounts and those settled in the most solemn manner, when there happens to be any complication in their nature."

The policy of the law, however, is strongly against permitting certain transactions to stand which have been entered into, when confidential relationship exists between the parties, without allowing an inquiry; but this doctrine does not extend to a stated and settled account between principal and agent when there has been an actual accounting, although there may have been confidence and trust. *Philips* v. *Belden*, 2 Edwards' Ch. R., 15. It has been held that the doctrine in question does not apply to the settlement of an executor upon the footing of which a release is given. *Davis* v. *Spurling*, 1 Tamlyn, 199. Nor does it apply to a settlement between guardian and ward. *Caplinger* v. *Stokes*, Meigs R., 180. Indeed the doctrine seems, from the adjudged cases, as will be shown in another part of this opinion, to be confined alone to the relation of attorney and client, in which there exist peculiar elements of confidence and trust not to be found in that of principal and agent or any other confidential relation.

This statement of the general principles of law will enable us to consider the particular claims of the com-

pany and to determine the effect, if any, which these claims are to have on the settlements and ultimate indebtedness between the parties. As these claims for relief seem to be pretty much separate and independent of each other—though having, in theory of learned counsel, a common basis, the relation of principal and agent—the order of their examination cannot be important to the attainment of justice or the proper adjustment of the rights and equities of the parties.

1. It was thought to be very important, owing to the large increase of the mining population, to secure the services of two skillful and competent physicians, who were to reside in Ducktown, which was in the midst of sundry mines and smelting and refining works, and to render such surgical and medical attention as the employees might need. In the fall of 1865 Raht, as agent for several mining companies and properties, entered into a contract with doctors Aubright and Kercherside, the employees of the different mines agreeing to pay one dollar per month out of their wages, and the Union Consolidated Mining Company and the Burra-Burra Mining Company agreeing to pay each a bonus of three hundred dollars and to furnish Dr. Aubright a house free of rent for one year. Raht was at the time agent for both of these companies, and perhaps for other companies in the neighborhood, and was managing and carrying on some mines and mining operations in his own name. The contract with the physicians was for one year only, and at the close of the first year the companies above named ceased to have any connection with the further em-

ployment and payment of the physicians. Doctors Aubright and Kercherside continued to reside in Duck town and render the needed services and attention, receiving from employees the one dollar per month out of their wages without deduction or loss of any kind. These monthly sums were paid over promptly by Raht on every pay-day, though it often left the employees indebted a balance in his store. During the year 1869 he required the physicians to allow him ten per cent. on the amount of collections from employees for his trouble in collecting and paying it over, and the physicians agreed to his proposition. This arrangement continued to exist as long as Raht acted as agent of the Union Consolidated Mining Company.

Now the company insists, upon the footing of the confidential relationship of the parties, that the whole amount thus charged and received by Raht belongs to it; that it has the right in equity and good conscience to recover the same with interest. We have not been able to find any principle of law upon which the claim can be allowed. It was no part of Raht's duty as agent of the company to collect and pay over these monthly dues from the employees to the physicians; nor did the money, when collected and in his honds, belong to the company in any conceivable sense; and, therefore, no trust attached to its management as between Raht and the company. It is equally certain neither the company nor its employees sustained any loss or injury by the arrangement. It is not pretended that the company was entitled to the whole time and services of Raht in the management of its

property and business, for the board of directors by special resolution allowed him to act as agent for other mining companies and properties, nor can it be said that the company's interests sustained any injury in consequence of this agency for the physicians. With equal reason and equity the company might claim his earnings as agent for other companies, or the profits realized from the working of his own mines, mills and farms. We think the general principles of law already laid down which define the duty and liability of agents to their principals, repel this claim of the company.

2. Complainant Raht accepted, as already stated, the position of sales agent in May, 1867, and continued to hold it until the middle of September, 1872. He was to have full control and management of the shipment and sale of the entire production of refined copper, the company agreeing to pay all legitimate charges and expenses on the shipment of the same. The company had uniformly transported its copper, intended for the New York market, via Norfolk, and had insured or required it to be insured in transitu. After getting into market, it was sold through the agency of a copper broker. Complainant Raht continued, after being made sales agent, to ship in the same way, and selected his brother Charles Raht to be consignee and broker in New York. It appears that Charles Raht had the shipments of refined copper insured in the Atlantic Mutual Insurance Company, having an open policy in that company to cover all shipments to him as consignee, and that the com-

pany continued, after the termination of the sales agency, to insure its copper for the New York market in the same company. This insurance company was organized upon the mutual, not the joint stock plan, and divided the annual profits among its patrons, issuing to them what are termed scrip-dividends. These dividends were not paid to the parties to whom they were issued, but they became a part of the capital stock, and were liable to be taken and used in payment of existing debs and subsequent losses of the company. No doubt such scrip dividends were issued to Charles Raht, made up in part out of premiums paid on shipments of the company's copper; but it does not appear that complainant Raht ever received any portion of these dividends or had any connection whatever with the dealings and transactions between his brother and the insurance company.

It is insisted that defendant company is entitled to the scrip-dividends represented by the premiums paid on the shipments of its copper, and that complainant Raht is liable and bound to account for the same. We are not prepared to say, if all other difficulties were out of the way, that the company is entitled at law or in equity to any part of these dividends; but we do not intend to express a positive opinion on the subject. There is certainly great plausibility. not to say intrinsic justice, in the view of the New York Chamber of Commerce, to the effect that the scrip-dividends belong to the person effecting, and not to the party for whose benefit the insurance is effected; and the long and general acquiescence and accord of

commercial and business men in the same opinion, strengthen very much the argument in favor of its soundness and justice.

But there is another distinct and independent ground upon which we are constrained to deny the claim of the company. It appears most satisfactorily from the testimony of Samuel Congdon, the first general agent at the mines and a director during the whole period of Raht's being sales agent, that the board were fully informed of the facts that Charles Raht insured the copper in the Atlantic Mutual Insurance Company and received and claimed the scrip-dividends issued for the premiums paid on account of that insurance. He further states that the directors discussed among themselves the subject of the ownership of these dividends, and arrived at the conclusion that the company was not entitled to them. With this knowledge of the facts the company made settlements with the sales agent without claiming the scrip-dividends, renewed from time to time the contract for the agency without mentioning the subject of insurance, and bought out the unexpired term of the agent at a pretty large price without intimating any error, mistake or omission in the previous settlements. It cannot be maintained that there was any fraud, or mistake, or manifest error in the omission to charge Raht in the settlements with the scrip-dividends. Apply the principles of law which define and regulate the effect of the plea of stated and settled account in courts of equity, and we must hold that the company is concluded by the settlements and cannot be allowed to set up claim to the dividends.

Raht *v.* Mining Company.

Indeed, to allow the company to change its opinion and action and to claim at this late day the scrip-dividends, would be to sanction a great injustice, if not a manifest fraud, against the rights and equities of complainant Raht.

3.  It is claimed in the cross-bill and earnestly insisted in argument that the company is entitled to recover from Raht the compensation allowed him as sales agent and the twelve thousand dollars paid him for the unexpired term of the last contract. These two claims may be very properly classed under one general heading, but they deserve to be separately considered. We will consider, in the first place, the question of compensation. Now the sales agency was a separate and distinct business from that of the general agency and superintendency of the mines and works, and it seems to have been so regarded all the while by the company's directors and officers; hence the company and Raht, holding the position of general agent and superintendent, must be regarded in their negotiations about the agency and its renewal from year to year as dealing with each other at arm's length, the validity of these contracts depending upon the same considerations as affect contracts of like character between strangers.

The claim of the company in question rests upon the allegation that Raht falsely and fraudulently represented to the board of directors that the means of the company were insufficient to carry on its mining and smelting operations and business, and thereby induced the directors to enter into the various contracts

for the sales agency. And upon the footing of this allegation the court is asked to annul the contracts and compel Raht to restore the compensation paid him during the whole period of the agency. There are other charges made in this connection, reflecting with more or less severity and condemnation upon the conduct and motives of Raht and the character and purpose of the contracts, but they are either too general and indefinite in terms or too remote in their bearing upon the issue to deserve special notice.

We cannot assume, without strong and clear proof, that the directors were incapable, unfaithful, or even careless in the discharge of the duties and trusts imposed upon them. Looking to the minutes of their action as a board, the correspondence of their officers with the agent Raht and their frequent visits to the mines, we are justified in the conclusion that they fully understood the resources and necessities of the company and acted in the matter of the sales agency in good faith and with reasonable prudence and wisdom, considering the utter failure and persistent refusal of the stockholders to provide a permanent working capital. It appears that Jennison Eager, who was a director at the time, was the first sales agent, having been made such agent some time in the year 1866. He was allowed the same commissions, brokerage and rate of interest, and was required to do the same things which were subsequently allowed and required in the contracts with Raht. Although Eager did not hold the position of sales agent for a whole year, the company on final settlement was indebted to him some

thirty thousand dollars, and shortly after Raht was made sales agent the board admitted an indebtedness to him of near thirty-seven thousand dollars, saying the company needed more money to prosecute its business, and giving a lien on its personal property, ores and ingot copper to secure the existing debt and future advances.

Now these facts, without mentioning others equally significant, establish beyond dispute that the company did not have the means necessary to carry on its mining and smelting operations, but had to resort to the scheme of the sales agency in the first place and to continue it afterwards for the very purpose of raising the means. It follows necessarily that the allegations of false and fraudulent misrepresentation on the part of Raht in obtaining the original contract of the sales agency must fall to the ground, and as the financial condition of the company did not materially improve, or at least did not provide the necessary working capital until sometime after the last renewal of the agency, the same thing may be said of the charge of fraud in its application to the various renewals of the contract. There being no ground upon which the original contract or its different renewals can be set aside or annulled, they must be held binding on the company according to the true meaning and import of their terms.

It is, however, further insisted that the compensation both for commissions and brokerage is exorbitantly large, looking to the responsibilities incurred and the services rendered; and quite a large body of proof is

introduced upon this subject.   We have not looked critically into the proof, but we have gone far enough to see that it does not make out such a case as will justify a court of equity in changing, modifying, or setting aside a solemn agreement entered into between parties fully competent to make valid and binding contracts.    The parties seem to have fixed with much apparent deliberation and care the amount of compensation, beginning as far back as the year 1866; they oft and repeatedly embodied it in solemn written agreements, and they continued it for many years without charge or complaint from any quarter.   Looking to the character of the contracting parties for intelligence and to their opportunities for ascertaining the true value of the services and risks, especially those of the directors, we think their detiberate judgment and action, extending through a series of years, are entitled to far greater consideration and weight than the opinion and observation of an indefinite number of men, whose engagements did not impose upon them the duty and trust of looking thoroughly into the subject.   It cannot be maintained, in view of all the proof with any show of success, that the commissions and brokerage were so large and excessive as to shock the conscience, or strike the mind with amazement, or that there are any such circumstances of suspicion, taken in connection with the amount of compensation, as will authorize a court of equity, even where a confidential relation exists, to set aside the old, or make a new agreement for the parties.

In addition to all this, whether the compensation

Raht v. Mining Company.

was reasonable or exorbitant was as well and fully known to the directors while they were paying it as it could possibly have been when they filed their cross-bill. They could have seen from every report of the sale of copper and from every settlement, and no doubt did see from both of these sources of information, that commissions and brokerage were uniformly retained out of the proceeds of the sales. They approve these reports and settlements without objection for the period of some seven years, and commute the profits of an unexpired term of the agency by paying the agreed value of them, and for the first time make complaint three years or more after the agency had ceased to exist. To reopen the settlements of the parties and direct an inquiry into the market-value of the services and risks of the agent would most certainly enlarge the powers of courts of equity far beyond the established principles of law which define the nature and effect of the plea of stated and settled account.

The views above expressed about the question of compensation, apply with equal force and propriety to the other branch of the claim. It appears from the settlement, made in June, 1872, that there was a small balance due from Raht to the company. As the sales agency had been adopted and continued from year to year to provide a working capital, this change in the financial condition of the company seemed for a time to dispense with the positive necessity of the agency. The company appears to have done well under the combined agency and management of Raht, for it had, between the years 1867 and 1872, paid off a debt of

some thirty-seven thousand dollars, and had on hand a small balance in its treasury, having in the meantime made valuable and permanent additions to, and improvements of its property. By the express terms of the last contract with Raht, it was not to expire until the end of the year 1873. The board desired to discontinue the agency and to entrust the sales of the copper to its president and secretary.

Now the draftsman of the cross-bill goes no further than simply to allege that the adjustment and settlement of the unexpired term of the agency was obtained by the "like fraudulent suppression and misrepresentation of facts" on the part of Raht, pointing back to the charge of fraud in obtaining the contract of the agency. Without entering into a minute detail of the facts and circumstances, it is enough to say that the proof fails to establish any suppression or misrepresentation of important or material facts, or any circumstance of suspicion or unfairness in the conduct of Raht. An executive committee, composed of president Thomas and directors McCauley, Smith, Cammach and Kimber, and clothed with the full powers of the board to act in behalf of the company, visited the mines, examined carefully into all the departments of the company's business, conducted the negotiations and concluded the trade, agreeing to pay Raht twelve thousand dollars for the surrender and extinguishment of his interest and rights under the contract. It is quite certain that the confidential relationship of the parties had no influence one way or another in producing the result, for the negotiations show that the parties were

Raht *v.* Mining Company.

dealing with each other at arm's length. The trans-
action was not the result of thoughtless haste or in-
advertent oversight; it was not even considered or
discussed until a careful inspection and examination
had been made into the mines and works and the
detail of their operations, nor was it concluded at
Ducktown, but on the return of the committee to
Cleveland. The whole matter seems to have been
fully and freely discussed among the members of the
committee, and they did what they thought was for
the best interest of the company under the circum-
stances.

There is not only an utter failure to establish any
suppression or misrepresentation of material facts, but
the allegations of the cross-bill are too general, uncer-
tain or indefinite to raise the question of fraud. They
do not specify or point out, nor does the proof es-
tablish a single fact, material or important to the
determination of the subject-matter of the negotiation,
that was suppressed or misrepresented; and as a con-
sequence, the transaction must be held free from the
taint of fraud. Being aware of the conclusive force
of these positions, the learned counsel for the company
have pressed with great earnestness and ability what
they are pleased to style the grossly unjust, inequit-
able and unconscionable character of the transaction.
Courts cannot make new contracts for parties, nor can
they relieve persons *sui juris* from merely hard bargains.
Lord Hardwicke lays down the principle, and Chan-
cellor Kent adopts it as sound law, that if a person
will enter into even a very hard and unconscionable

bargain with his eyes open, equity will not relieve him, unless he can show fraud in the party contracting with him, or some undue means made use of to draw him into the agreement. *Willis* v. *Jennegan,* 2 Atk., 251; *Murray* v. *Toland,* 3 John. Ch. R., 575. During the negotiation, the committee offered eight thousand dollars for the unexpired term of the agency and Raht demanded sixteen thousand dollars, but by interchange of views and mutual concessions, they agreed upon twelve thousand dollars; and not long afterwards, the board paid this amount and took the management of the sales of the copper into its own hands. That a principal may buy from his agent and an agent sell to his principal, seems to be settled in all the cases. The ground on which disability or disqualification rests, is no other than that principle which dictates that a person cannot be both judge and party. When the court can see, as in the present case, that they deal with each other at arm's length, that the agent does not conceal any fact within his knowledge, important for the principal to know, and that the principal has open to him the means of information necessary to the formation of a reasonably correct conclusion, their dealings and transactions must stand upon the same footing as like dealings and transactions between strangers. And applying these principles of law to the facts and circumstances in this case, we cannot direct the restoration to the company of any portion of the twelve thousand dollars paid to Raht for the purpose and in the manner above described.

4. It is alleged that Raht discriminated in fixing the price for hauling the products of the mines and works from Ducktown to Cleveland and his own goods and supplies from the latter place to the former, and for this difference in his favor he should be held to account to the company. These products had to be transported from the one point to the other in wagons, and the goods and supplies intended for the employees of the company and the people of Ducktown constituted in the main the back loading for the same wagons. It is alleged upon information, but when and from whom the information was obtained does not appear, that Raht paid the exorbitant price on the company's freight by way of inducement and consideration to get his own at a lower rate.

It clearly appears from the proof that the rates on down and up loading were not established or introduced under the general agency of Raht, but were in full force and operation before the consolidation of the old mining companies into the new one. These discriminating rates were recognized and acted upon during the general agency of Mr. Congdon, and Raht as his successor simply continued them, having after a time reduced the rate on the products of the mines and works from seventy to sixty cents on the hundred pounds. When the company had return or up loading it was charged the same price as other freightors, being fifty cents on the hundred pounds; and when there was no down loading for the wagons, all owners of freight, including the company, had to pay seventy cents per hundred pounds. The rate per hun-

dred pounds both ways appeared distinctly itemized in the monthly statements of account, and was therefore well known to the board of directors from the very beginning of the company; and with this full and exact knowledge on the part of the directors, they made settlement after settlement, based upon the correctness of these statements, and acquiesced in the wisdom and justice of the discrimination for the period of seventeen years or more.

If there had been no settlements between the parties and no acquiescence on the part of the company, we would hesitate long before holding a discrimination like the one complained of unreasonable and unjust. Common experience and observation teach us that such discriminations are not unusual under like circumstances, and many plausible reasons may be adduced to show them both reasonable and just in the present instance. The products of the mines and works had to be gotten into market, or then the mines and works themselves ceased to be of any value or profit, and to their operations the goods and supplies were not only contributory, but absolutely essential. The former constituted the primary, leading and paramount business for the wagons, while the latter was merely secondary and dependent. It may also be doubted whether Raht and the other merchants, doing business in so remote and isolated a place as Ducktown, and in the midst of a population so dependent upon their wages for the necessaries of life, had much concern about the price for up loading, for it would most probably be paid by the buyers and consumers of the

goods and supplies, and not come out of their profits. But there being neither fraud nor mistake properly alleged or proved, the plea of stated and settled account, coupled with the long acquiescence in the wisdom and justice of Raht's course, interposes a complete defense against the claim of the company and relieves him from all liability to account for any part of the difference in the freight rates for down and up loading.

5. It appears that some twenty-five miles of the road leading from Ducktown to Cleveland lie on the banks of the Ocoee River, which is hemmed in by mountains on both sides. It is alleged that Raht, as agent of the company, expended annually for some ten or more years large sums of money in repairing and keeping this mountainous portion of the road in passable condition, and induced the company to buy the interest and title which the Ocoee Turnpike and Plank Road Company had in and to the road. But these transactions are substantially approved, or, at least, they are not made the grounds of special complaint. It is, however, further charged that Raht, when these expenditures were made, was the owner of a valuable mill and two extensive and valuable farms situated on or near the road, and had more use for it in the prosecution of his own private business and carried over it a great deal more freight than the company, which facts were well known and fully understood by him, but were not known, understood and appreciated by the company. It is also charged that his relationship to the company imposed upon him the duty of

fully disclosing his personal interest in the road, which he failed to do. And, upon the basis of these charges, it is claimed in the cross-bill, and seriously urged in argument, that Raht shall be held to account for his *pro rata* share of these expenditures.

Learned counsel have not stated the particular principle of law or cited any adjudged case upon which they predicate the claim, but they rest it upon what they call "the plainest principles of justice." They concede that the road was indispensable to the successful and profitable operations of the company's mines and works, for the obvious reason that it constituted the only outlet to market for their productions. They also admit that the expenditures were barely sufficient to keep the road in passable condition for hauling, and were regularly and accurately reported in the monthly statements of the agent, and fully approved by the board of directors. We are wholly unable, in the face of these concessions, to perceive any principle of law or equity upon which Raht can be made liable for any portion of the expenditures. If any foundation whatever for the claim can be discovered from the pleadings and argument, it must consist in the failure of Raht to disclose the nature and exact extent of his private interest in the road's being kept iu passable condition. What conceivable effect would either a failure to disclose, or a full and minute disclosure of this interest, have had upon the action of the company? Whether the company knew or did not know Raht's ownership of the mill and farms and his private interest in the road, would not have less-

ened or diverted a dollar of the expenditures for keeping it in passable condition.    It had to keep the road in condition for loaded wagons to pass over it, or suspend active operation of its mines and works.    The reason and policy of the rule of law, which requires agents to make full disclosures of their private interest to their principals, have no application whatever to a case like the present one.

It cannot, as matter of fact, be maintained that the board of directors were ignorant or uninformed of the nature and extent of Raht's private interest in the road's being kept in passable condition.    All the directors knew he owned two mines and was interested in others in the immediate neighborhood of the company's mines, the products of which had to pass over the road to market, and that he was carrying on the business of merchandizing on a very large scale, the goods and supplies for his store having to be transported over the same road.    Indeed, they must have been informed of his ownership of the mill and farms in question.    Some one or more of the directors and officers of the company passed over the full length of the road every few months in going to and returning from Ducktown.    Such mills and farms, so profitable and extensive, located in a region so out of the way of general travel, would attract the attention of mere passers-by, and very naturally provoke inquiry after their owners.    As large amounts for repairing were coming in monthly, we may reasonably conclude that the directors and officers visiting the mines examined the road the whole distance, and could not have failed

to observe the mill and farms or to have ascertained their owner, especially as the owner was in their own employment as general agent and superintendent of all their mining property.

There is, moreover, an intrinsic, insurmountable difficulty in adjusting the proportions of the expenditures between the parties who would have to bear a *pro rata* share upon the theory of Raht's liability. All the owners of mines and farms, and the wagoners, and all other persons who derived any benefit or profit from the use of the road, would be equally bound with Raht to sustain a proportionate part of the expenditures, the amount in each instance depending upon the nature and extent of the benefit or profit derived from the use of the road. Thus the whole matter of the company's equity resolves itself into a practical absurdity, which courts of equity cannot and will not make the basis of a decree for relief of any character. In addition to all this, the facts and circumstances place this supposed equity within the conclusive effect of the plea of stated and settled account.

6. It is maintained in the cross-bill, but pretty much abandoned in argument, that the agent Raht kept employees on wages when the refining works were standing still and their services were not needed; and this course was pursued to increase his trade and to enable him to collect debts already created in his store. The cross-bill fails to mention the employees, or any one of them, who were kept on wages without doing work or rendering services for the company, but it may be inferred they were employed in the

refining works, as their idleness seems to result from the standing still of those works.   In view of the fact that the monthly statements disclosed by name the employees engaged in both the mines and works, and the amount of their daily wages, it can hardly be said that the allegations of the cross-bill are sufficiently definite and specific, under the rules of law, to open the settlements for the purpose of surcharging or falsifying them.   But we do not rest our decision upon the insufficiency of the allegations of the cross-bill.

We think the answer of Raht presents a full and complete defense for his course, and the proof does not controvert the truth of its statements in this particular.   The business of producing refined copper, as it seems, requires workmen of skill and experience, and such workmen could not be obtained in the locality of the company's works, but had to be engaged beforehand and brought from a distance, incurring thereby considerable trouble and expense and attended with more or less delay.   The refining works were kept in active operation some nine months in the year, and stood idle generally the other three months, without the fault of the agent.   If these skilled and experienced workmen had done no work or rendered any service whatever during these three months, it would have been a saving to the company to keep them near the works on their usual wages rather than to incur the expense and suffer the delay incident to bringing them back or engaging and transporting others from distant points.   But they were not allowed to

continue on wages without some profitable employment; they were kept at work in other departments of the company's business, and were not mere idlers and parasites on its resources. These facts, so consonant with experience and common sense, not only meet and refute the claim of the company, but repel the selfish and unworthy motives attributed to Raht, and tend strongly to produce the conviction that the allegations were improvidently and incautiously made.

7. Serious complaint is made on account of the abandonment of monthly and the adoption of quarterly pay-days at the mines. It is said Raht recommended the change for some selfish, sinister purpose, and the board of directors adopted it out of blind confidence in his judgment and ready deference to his advice, the company being thereby injured and Raht benefitted; but in what way the one was injured and the other benefitted does not clearly appear in either the allegations of the cross-bill or the argument of counsel. Before Raht's acceptance of the sales agency, pay-days had ceased to be held monthly, but had become somewhat irregular, depending upon the fluctuating condition of the company's finances. It was stipulated in terms in the first contract that settlements at the mines should not be made speedier or oftener than they had been before that time.

It thus appears that quarterly pay-days took the place of monthly ones about the date of Raht's acceptance of the sales agency, and were continued from year to year by express stipulations in the different renewals of the contract as long as he remained sales

agent, and were not changed or discontinued until some time after the beginning of the present litigation. It is said, and no doubt truly, that he recommended the change for several reasons, which were fully and frankly stated to the board of directors, but the proof fails to show that the recommendation was dictated from motives of profit and gain to himself, or with any want of perfect good faith to the best interest of the company. These reasons have great plausibility and force in them, and would lead intelligent and impartial minds generally to the same conclusion.

But we need not analyze or discuss the soundness or unsoundness of these reasons for any purpose of the present inquiry. It is enough that there are no sufficient allegations, and, most certainly, no satisfactory proof of fraud, overreaching or mistake in the matter of the change, and that the board of directors sanctioned and adhered to it without intimation of any doubt as to its propriety and wisdom for the period of some nine years, embodying their approval of it in several solemn contracts and agreements. We cannot overlook or disregard this oft and repeated action of the board, ratifying the change, nor can we under the established rules of law set aside the special stipulations in these contracts and agreements, establishing and continuing quarterly pay-days in the place of monthly ones.

We stated above that the injury to the company and the benefit to Raht, alleged to arise out of the change, did not clearly appear. Beyond doubt the employees of the company were in the main poor la-

borers who needed their wages for the daily support and maintenance of themselves and their families; but the proof does not establish they could or would, with monthly instead of quarterly payments, have worked for lower wages. It is not claimed that any employee on account of the change abandoned the service of the company or received or even demanded any increase of wages. It results that no actual injury was done to the company, for it could only have been injured by loss of employees or increase in their wages. It is equally certain Raht did not derive any personal benefit from the change. It is said the employees were forced to buy more largely in his store for want of ready money to make purchases elsewhere; but the proof fails to show any such result flowing from the adoption of quarterly pay-days; and most certainly sound reason and common observation of the dealings of men would not indicate any such result as likely to flow from the change.

8. It is charged that the company sustained, in 1875, a heavy loss in the estimated value of its ores, amounting to five hundred and sixty thousand pounds of refined copper, worth not less than one hundred thousand dollars; and it claims that Raht shall be held to account for the whole of this loss. It appears that some time in 1871 an arrangement was entered into by the terms of which the company was to use as a flux in smelting its own ores, certain ores to be taken from the Burra-Burra mines and from some mines belonging to Raht, and for the ores thus used as a flux, he was to receive in refined copper

one-half of their assayed value.    We need not further notice this contract, though many and severe epithets are applied to the conduct and motive of · Raht in obtaining it, for the reason that the contract itself is not so much relied upon as presenting a separate and independent ground for relief, as furnishing one mode or means of accounting for the large loss above mentioned.    There is no reason to doubt, under the proof, but that these ores did make a good flux in smelting the ores of the company, and that no loss or injury was sustained by their use as a flux, though the company returned one-half of their value for the other half, as stipulated in the contract.

It appears that the company had in its employment skilled and experienced assayists and chemists, who examined the ores as they were taken from the mines and estimated the percentage of refined copper in them, and who made monthly reports for the information of the general agent and superintendent and of the board of directors, giving the quantity and value of each month's mining.    These reports were prepared and signed by the assayists and chemists and forwarded along with the monthly statements of the agent and superintendent to the board of directors. An account of stock of copper in the company's ores and smelting products was taken on the 1st day of May, 1875, when the apparent loss was first discovered; but it does not appear when any previous account of stock was taken, perhaps not for many years prior to that time.    In taking this account of stock the quantity and value of the ores were no doubt ascertained

from the reports of the assayists and chemists, and from the general aggregates of quantity and value, the actual production of refined copper and the amount of ores consumed, were deducted, thereby disclosing the alleged deficit. Immediately on the discovery of the apparent deficit, Raht notified the board of directors, and in reply to a letter of president Thomas asking for an explanation of the cause, assigns various reasons for it, but admits they are not satisfactory to himself. He says in the same letter, that in becoming aware of the enormous deficit he examined into every branch of the smelting business and found that a roast pile, when assayed after roasting, would not yield as much copper by about one per centum as before roasting, the manner of this loss being beyond his power to explain. It seems to have been the settled, uniform rule of the company, from the time of its organization, to allow a deduction of one per centum from the assayed value of the crude ores to cover the known and usual losses and wastings in the processes of roasting, smelting and refining. Regarding the deficit as resulting from this per centum being too low, Raht turned over at once to the company sixteen thousand seven hundred and fifty pounds of ingot copper, supposing it amply sufficient to make up the loss on the ores used as a flux from his own and the Burra-Burra mines.

We do not concur in the opinion which learned counsel for the company seem to entertain, that Raht shall be held to account for the apparent deficit, whether the company sustained an actual or merely a

probable or possible loss.  Suppose the assayists and chemists made a mistake in their equivalent estimate of the richness or value of the ores, or that the per centum for losses in roasting, smelting and refining, fixed and acted upon by the company for a long series of years, was put at too low a figure, and that here was not in fact the amount of copper in the ore which the reports of the assayists and chemists indicated.  Upon what principle of law or equity can the company claim anything from anybody for such errors, mistakes and miscalculations?  It is an axiomatic principle of law, defining the liability of agents to their principals, that there must be a real loss or an actual damage, and not merely a probable or possible one, and the loss or damage must be attributable as a natural or just consequence from the wrongful act or omission of the agent.  Story's Agency, secs. 217, 222.  And these principles run through and qualify and limit all the phases of an agent's liability to his principal.  Assuming the correctness of Raht's theory, there was no real loss or actual injury sustained by the company, and consequently no liability attaches to him or anybody else.

It is, however, insisted that there are several hypotheses more plausible and reasonable than any Raht has offered to solve the mystery of the apparent loss. These hypotheses assume that he reported and was credited with larger expenditures for mining the company's ores than were actually made, or that the ores from his own and the Burra-Burra mines were overestimated for his benefit, in quantity or quality, or that

4—VOL. 5.

the copper was stolen from the company and converted to his own use. There is not a single fact in the record, relied upon as tending to establish the truth of these assumptions, that is not susceptible of an honest and totally different explanation and application. The assumptions impute gross dishonesty and moral turpitude to Raht and involve others in equal guilt with him. If they were true in whole or in part, it was in the power of the company to prove it. Had Raht charged and been credited with more for mining the company's ores than was actually expended, or if the ores, used as a flux from his own and the Burra-Burra mines had been over-estimated in quantity or quality, the assayists, chemists and the officers having immediate charge of the mines and laborers working in them, must have known the facts and could have proved them. So if he had taken from the company and converted to his own use so large an amount of refined copper, the officers and workmen, having charge of and carrying on the smelting and refining works, the wagoners hauling it from Ducktown to Cleveland, and the freight-agents and clerks, attending to its shipment at the railroad depot, would have known the fact and could have confronted and convicted him of the theft. It is intimated that all the officers under his supervision and control, including even Tonkin and Mueller, who were retained in their positions under the new management of the mines and works, were mere instruments in his hands to do his bidding, and to conceal his frauds and peculations. If this had been true, he would have induced the assayists and

·chemists to report the gradual impoverishment of the ores as well as a reduction in the quantity mined, and thereby have made it neceessary to raise the per centum for losses in roasting, smelting and refining from one to two or three per centum, thus giving ample scope and margin for peculation and plunder, yet embarrassing greatly if not precluding altogether, the possibility of detection and exposure. Assuming the truth of any one of the hypotheses, he must have known the source and amount of his dishonest gains and plunderings, and that the taking of an account of stock of copper in the ores and smelting products would expose as in the light of open day these gains and plunderings; yet, without any direction from the board of directors, or request from any person interested in the company's business, so far as the record informs us, he took of his own volition and choice the account of stock in the month of May, 1875, thereby exposing the very thing of all others that guilty kno ledge would have delayed and concealed to the latest possible hour. These considerations go very far, if not the whole way, to establish that the hypotheses in question rest alone upon mere conjecture and surmise, and cannot, therefore, be adopted or sanctioned as reliable foundations for judicial investigation and decision.

Let us inquire if the facts and circumstances do not establish with reasonable certainty, that the apparent deficit of copper resulted from too low a percentage for losses in roasting, smelting and refining the company's ores. It is no doubt true, as argued, that

diminution in the richness of ores takes place as a general thing gradually, not suddenly, extending through years without any marked decrease; but this position does not in anywise militate against the correctness of the theory under examination. True, the discovery of the supposed loss in this case, was sudden, unexpected and startling, no less unexpected and startling to Raht and his subordinate officers than to the directors themselves. We think, however, that the most probable cause of it extended far back in point of time and had been accumulating force and headway for many years, and but for the taking of the account of stock in 1875, would have continued to swell and enlarge the volume of the company's apparent loss. Scientific experts say poor ores suffer greater losses in the process of refining than rich ores, regard being had to the relative percentage of copper in each; hence a per centum for losses fixed for the one class of ores, will prove a false and delusive guide when applied to the other. Whether the dry or humid process of assaying be adopted, there cannot be exact, but only approximate accuracy in estimating either the percentage of pure copper or the percentage of losses in roasting, smelting and refining the different kinds and grades of ores. So the operation of reducing crude ores to refined, ingot copper, involves numerous tedious and difficult processes, especially with ores like those taken from the mines in the vicinity of Ducktown, and many of these processes require most careful, constant and prompt attention and management from the beginning to the end to prevent serious

waste and loss. Even too much or too little heat at certain stages of the operation will materially lessen the production of pure copper.

It is also in proof that the ores taken from some of the company's mines had been, for many years prior to the discovery of the loss in question, diminishing in richness, and that very low grades of ore have been in pretty common use since the smelting and refining works were put in operation. It seems to be an established fact, that the mixing of low-grade ores with rich ores in the processes of roasting, smelting and refining, increases the percentage of losses on the rich ores, without diminishing the usual per cent. of losses on the poor ores. Both Tonkin and Mueller, whose intelligence and truthfulness are not assailed, state that if two, instead of one, per centum for losses had been allowed on the company's ores, the whole amount of the apparent deficit of copper, in the present instance, would have been fully explained and accounted for. And the decided weight of the proof establishes, that, considering the quality of the ores used during the last years of Raht's agency, the mode of assaying, and the manner of producing ingot copper, at the works, a deduction of two per centum for losses in roasting, smelting and refining would be both reasonable and just.

But the deliberate action of the board of directors places this matter of fact beyond controversy, for it sanctions the correctness of the estimate of two per centum for the usual losses on the ores. It is substantially admitted, in the annual report of the board

for 1875, that the ores had of late years been run-
ning at a lower percentage of copper, and the losses.
were greater than had been allowed in the calculations.
More careful and thorough assays of the company's
ores must have been made soon after Mr. Duvall took
charge of the mines and works, for, in a very few
months afterwards, the percentage for losses was raised
from one, and firmly fixed at two per centum. And:
the board of directors, in its annual report for 1876,.
approves and confirms the correctness of this estimate,.
in the most positive and unequivocal manner, for it
arrives at the amount of pure copper in the ores and
smelting products, then on hand, by allowing and de-
ducting two per centum for losses in the processes of
roasting, smelting and refining.

In view of the foregoing considerations, it cannot,
most certainly, work any hardship or injustice to the
company if this court shall give Raht the benefit and
advantage of the percentage for losses which its own
directors and officers have declared to be reasonable
and just. Applying, as we must do, from a convic-
tion of its truthfulness and correctness, this principle
of even-handed justice, the apparent loss of copper
complained of is fully explained and satisfactorily ac-
counted for, without impugning the character of Raht
or any other person for honesty and integrity, or in-
flicting any real injury or actual damage to the com-
pany.

9. We now proceed to consider the main ground
for relief under the cross-bill. The company claims
the whole net profits of the store, carried on at the

Raht v. Mining Company.

mines in the name of Raht, and for his individual
benefit, from the commencement to the termination of
his general agency.    These profits, with others arising
out of and dependent upon the exercise of the "store
privilege," so styled in the pleadings, amount, as the
company alleges, to a million or more dollars.    This
branch of the case has been discussed on both sides
at great length, and with marked ability and learning,
and the importance of the questions discussed, and the
magnitude of the sum involved in the issue, well merit
the time and labor bestowed on it.

The company did not own the store, or have any
money or means invested in its business; it did not
incur any liability or run any risk on account of the
purchase, ownership or sale of the goods and supplies;
it did not pay any part of the expenses, or suffer
any part of the losses for bad debts; it did no more
than simply to grant the privilege of establishing and
maintaining a store at its mines, with the use of
some houses free of rent, and with iiberty to sell to
its employees, and collect out of their wages.    In a
word, the business of the company's mines and works
and that of the store were separate and distinct, but
in some sort dependent upon and mutually beneficial
to each other.    On the other hand, Raht acquired
the store privilege as part of the compensation for his
services as general agent and superintendent; had the
privilege renewed and extended from year to year,
furnished all the capital for running the store, incurred
all the risk of losses, paid all the expenses of sales-
men and clerks, and claimed all the profits as his

own personal, private gains. And during the whole period of the agency and the enjoyment of the privilege, annual settlements were made between the parties, and balances ascertained, and either paid off or secured by liens on property, the company never demanding, and Raht never offering, to turn over or account for any portion of the profits of the store.

Now, to enable the company to recover these profits, it must allege and prove enough to justify a court of equity in setting aside that part of the contract which created and secured to Raht the store privilege, for if this part shall be held valid and binding, the profits belong to him and not to the company. Whatever may have been the perversions and abuses in the use and exercise of the privilege, they do not involve and cannot affect the question of the legal existence and binding force of the contract. There are two things alleged in the cross-bill which occupy this relation to the store privilege. It is said that Raht agreed, as a part of the contract, not to sell goods and supplies to employees at a larger profit than ten to fifteen per cent. on cost. Suppose such an agreement, and an indisputable breach of it were established by the proof, it would not constitute any valid ground for annulling or setting aside the contract, but would present a case for the recovery of such damages as the company could show it had sustained. The existence of any such agreement, however, is positively denied in the answer of Raht, and there is not only no proof to sustain the allegation of the cross-bill, but, on the contrary, Thomas and Congdon, having ample oppor-

Raht v. Mining Company.

tunity to know all about it, prove that no such agreement was ever made between the parties. We may,
therefore, dismiss this matter out of the case altogether.

It is also said Raht promised to use the store
privilege in such manner as not to enhance the price
of labor or the cost of materials in the mines and
works. The making of any special promise to this
effect is positively denied in the answer, and if such
promise were made, the breach of it is denied in
equally positive terms. Suppose, however, both the
promise and its breach were clearly proved, it might
form a good ground for an action of damages; it
would not, most certainly, avail anything upon the
question of the validity or invalidity of the contract
itself. Pending the agency and enjoyment of the privilege, the breach of such an agreement might excuse
and justify the company in terminating the agency, or
discontinuing the privilege at once; but it would be
very unjust and inequitable to hold, after the agency
had ceased to exist and the privilege to be enjoyed,
that such a breach relates back to the creation of the
privilege, and operates to cancel the contract, and to
turn over to the other party all the profits derived
from its exercise and enjoyment. We dismiss this
matter for the present, but will return to it in another connection.

What are the precise grounds upon which the company predicates its claim to the profits of the store?
They may be stated in a few words. They consist
in general charges of suppression and misrepresentation

of material and important facts as to the value of the store privilege. The company alleges that the business of merchandising at its mines was a very valuable privilege; that Raht knew perfectly well its value, having derived his information and knowledge by virtue of his relation as general agent and superintendent; that he was, in consequence of that relationship, bound to communicate to its board of directors all his information and knowledge on the subject, and that he not only did not so communicate, but intended by all his communications to deceive and mislead the directors, and to impress them with the belief that the privilege was of but little value. This brief statement presents fully and fairly the grounds upon which the company rests its claim of the profits.

There are several difficulties which seem to lie in the way of granting the relief, and they deserve to be stated and considered with some degree of care and fullness. Conceding, for the present, Raht's duty to be as alleged, must not the company aver, specifically and positively, want of the necessary information and knowledge on its part? There is no such allegation in the cross-bill. It may, perhaps, arise, by implication, from the statements, that Raht did not make a full disclosure, but intended to deceive and mislead the directors into the belief that the privilege was of but little value.

It is wholly immaterial from what source, or in what manner, full information and knowledge are acquired. Did the principal have such information and knowledge—presents the only material inquiry. The

law never requires a useless and fruitless thing to be done, or an unnecessary and meaningless ceremony to be performed. Why require the agent to communicate that which his principal already knows? Neither the policy, nor the reasoning upon which the doctrine of full disclosure rests, has any application where the principal has acquired the necessary information and knowledge from other sources. It seems, too, quite reasonable and proper to require a principal, who seeks to set aside a contract or other ~action with his agent, for a failure to make a full disclosure, to negative, in direct and positive terms, the possession, on his part, of the information and knowledge which the agent's disclosure would communicate.

It also admits of very great doubt whether or not the doctrine of full disclosure has any application to a transaction like the one in question. It is true, as a general rule of law, that an agent cannot, upon his own volition and choice, assume a position, or enter into a contract, that may bring him into antagonism with the interest of his principal; but the rule does not apply where the principal consents to his taking the position or making the contract. When the principal consents that his agent shall act, in some matters, as agent for an opposing interest, this double employment may be accepted by the agent, and he must consider himself as bound to discharge his duty fairly to both of the parties. Wharton's Agency and Agents, secs. 56, 244. As stated above, the store privilege entered into and formed part of the consideration for the making and accepting of the original

contract of the general agency, and it likewise entered into and formed, in the same way and to the same extent, part of the consideration for each renewal of the agency and extension of the privilege. It was nothing, more or less, than an integral portion of the compensation which the company agreed to give, and Raht to accept, for his services as general agent and superintendent.

Beyond question, the parties were competent to enter into the original contract, and thereby determine the character and amount of compensation, without either one being compelled to disclose anything as to the real or relative value of the agent's services, for it was the creation, and not the continuation of an existing relation of principal and agent. Wharton's Agency and Agents, sec. 323. The parties, in defining the nature and scope of the agency, and fixing the character and amount of the compensation, must be regarded as dealing with each other as strangers, and at arm's length. The original contract of agency was only for the period of one year, and it was renewed, from year to year, upon the same terms, and with the same privileges, as in the original contract. Now, when the parties came together, each year, to renew the agency, and to continue the compensation, it seems, from the very nature of the transaction and the indisputable rights of each one, that they must be regarded, in law, as standing upon an equal footing, and as contracting at arm's length. They are not bound together any longer than for the existing term; either one, in negotiating for another term, may de-

mand and accept what the other is willing to allow and give, or they may dissolve the relation altogether. It would seem to be carrying the doctrine of full disclosure beyond the principle and reasoning of the adjudged cases, to hold that the failure of the agent to disclose the true value of his services, or of his compensation, in negotiating for a renewal of the agency, is a sufficient ground upon which to set aside the renewed contract, or to restore to the principal any portion of the agent's compensation.

Further, it can be hardly maintained, in any just sense of the doctrine, that the matter of the store privilege falls within the scope, or belongs to the subject-matter of the agency. Most certainly, neither the store itself, nor the profits thereof, constituted any portion of the company's property, nor did any trust attach to the same for its benefit, for the obvious reason that Raht might have given the goods and profits to a relative or friend, or wasted them in luxurious living, or made any other disposition of them to suit his pleasure, and the company would have had no sufficient ground to invoke the aid of any court to prevent it. It is equally certain that the carrying on of the store, and the receiving and investing the profits, did not fall within or constitute any part of the duties and responsibilities belonging to the general agency and superintendency of the company's mines and works.

True, an agent is not at liberty to act or contract, for his own benefit, in regard to the subject-matter of the agency, and the advantage of all that he does

:about the property in his charge accrues to the prin-
cipal, if he desires it; but it cannot be confidently
.asserted that the matter of the agent's compensation
falls within either one of the above limitations.    In
negotiating about his compensation, Raht was not, in
·any conceivable sense, acting as the agent of the com-
pany, and might, therefore, contract with its board of
·directors without restriction or limitation.    The rela-
tion of client and attorney is one of far more confi-
·dence and trust than that of principal and agent; yet
Lord Eldon says: "There is no authority establish-
ing, nor was it ever laid down, that an attorney can-
not purchase from his client what was not, in any
degree, the object of his concern as attorney"    The
Lord Chancellor continues: "Under such circumstances,
he is not attorney *in hac re;* and, therefore, not being
under any duty as attorney to advise against the act,
he may be the purchaser." *Montisquieu* v. *Sandys,*
18 Vesey, 313.    The weight of this authority cannot
be weakened by referring to the doctrine of courts of
equity on the subject of attorneys' fees.    Contracts
for fees between client and attorney, and for compen-
sation between principal and agent, will be found to
·stand upon totally different grounds in those courts;
but the distinction need not be considered in this con-
nection.

Suppose, however, we are mistaken in the views
above expressed — and we are not so well satisfied of
their soundness as to place our decision solely upon
them — we next inquire, did not the company have
.full information and knowledge as to the value of the

store privilege—and did not Raht make a full dis-
closure in the true sense of the rules of law? The
existence of the necessary information and knowledge
in one or more of the directors, is information and
knowledge on the part of the company. *Union Bank*
v. *Campbell*, 4 Hum., 394; *Tagg* v. *Tennessee National
Bank*, 9 Heis., 479; and the duty of full disclosure,
where it is imposed on an agent, does not import
in cases like the present one, a special communication
of the exact value or statement of the yearly profits
of the store. What the rule of law as well as sound
reason and common sense require, is such an amount
of information and knowledge, whether derived from
the agent or from other sources, as will enable the
principal to determine the approximate value of the
subject-matter of the negotiation, and to decide, by the
exercise of reasonable diligence, caution and reflection,
what will be for his best interest under all the facts
and circumstances existing at the time.

A brief review of the facts, which are not and
cannot be controverted, will fully and satisfactorily
answer the questions above propounded. During the
whole period of the agency and the exercise of the
store privilege, the company was unable to furnish at
any time the necessary means to carry on the mining,
smelting and refining operations, but was compelled
in order to raise even a working capital to resort to
various plans and schemes of effecting loans and ad-
vances, submitting in every instance to pretty hard
and onerous terms and conditions. The subject of its
undertaking to run the store was frequently discussed

among the members of the board, some favoring and others opposing it. It appears a majority of the board uniformly decided against embarking in the enterprise, founding their conclusion upon the inability of the company to raise the necessary capital as well as its inability to carry on the business with the success and profit which attended it under the management of an individual owner. The embarrassed condition of the company and the frequent failures of corporate bodies, engaging in hazardous enterprises outside of their regular, leading business, fully vindicate the sound sense and practical wisdom of this conclusion. So the company was both unable and unwilling to undertake the business of a large mercantile establishment in addition to its large and extensive mining operations. These facts place it in the novel and absurd position of being unable and unwilling to carry on the store, yet claiming and demanding all the profits of it, because the party running the concern and earning the profits did not give the company the opportunity of saying it could not and would not engage in the business.

The directors were, as already stated, gentlemen of considerable intelligence and large business capacity and experience, having been at some periods of their life merchants, brokers, bankers and capitalists, engaged in active avocations and pursuits in the city of New York. They made frequent visits to the mines, examined with care into all the departments of the company's affairs, looked into the working of the store privilege and its connection with employees and their wages, and had before them ample data from which

to ascertain with reasonable certainty the amount of the annual sales and profits. Samuel Congdon, the first general agent of the company resident at the mines and a director from the election of the first board to the election of a new board in 1873, was engaged in the business of merchandising in the midst of the mines before the formation of the present company, sold goods and supplies from forty to sixty per centum profit, but suffered considerable losses from bad debts, and, as will readily be seen, had abundant opportunities, with the simple exercise of some reflection and calculation, to arrive at the real, true value of the store privilege. As bearing directly upon the question of full information and knowledge, Raht in his interviews, conversations and correspondence with the directors and officers of the board, uniformly stated that the store privilege was very profitable to him; that on a capital of forty thousand dollars he sold yearly from one hundred and fifty to two hunded thousand dollars' worth of goods and supplies, thereby turning over the capital four or five times each year; that two-thirds of the wages for labor and cost of materials in the mines and works were paid off through the store, and that the business of merchandising could be made more profitable and remunerative to the company than it had been to him, expressing his willingness to surrender the privilege whenever the company thought proper to demand it. And, as conclusive upon this question of fact, a committee consisting of members of the board made, as far back as the year 1867, a thorough and minute

examination into business operations of the store, and into all the departments in which the company was directly or indirectly interested, and they prepared with great care and pains a full report, which was printed in pamphlet form and extensively circulated among the stockholders, capitalists and business-men of the country. After premising that two-thirds of the large disbursements for labor and materials were paid through the store, the committee say: "the company should keep its own store, and the large profits resulting from that source should go to the company." Notwithstanding this distinct declaration as to the profits of the store, the board continued to renew the agency and extend the privilege without objection or complaint from any quarter; and, as if in anticipation of future trouble and to avoid all just ground for it, Raht, upon the election of a new board in 1873, called, in a letter to president Thomas, which was read to the board, special attention to the above paragraph in the report of the committee, referring to his oft and repeated declarations for many years past to the effect that the store privilege was very profitable to him, and to the fact that the company still continued to leave it in his hands.

Now, giving due weight to these facts and circumstances, it is impossible to resist the conclusion that the directors had all the time ample information and knowledge as to the value and profits of the store privilege to enable them to discharge faithfully and fully all their duties and trusts to the company. Their information and knowledge went far beyond

Raht *v.* Mining Company.

what was merely sufficient to put them upon inquiry.
They were informed in so many words, that the pri-
vilege was very valuable and the profits very large,
and they assert the same thing from actual examina-
tion into the business.    Indeed they were furnished
with ample and reliable data from which they could
easily have ascertained, perhaps not the exact, but
most certainly within a thousend or less dollars, of the
exact amount of the yearly profits.

There is still another view which deserves a short
notice.    To this claim of the company, Raht also
interposes the defense of stated and settled account.
The company failing to establish fraud or mistake, or
manifest error in leaving the profits of the store out
of the various settlements, the plea of stated and set-
tled account must be held to be conclusive on the
parties, unless the confidential relation of principal
and agent forms an exception to the doctrine of courts
of equity upon the subject of that plea.    There is a
marked distinction as to the effect of the plea, be-
tween cases involving the relation of client and attor-
ney, and cases involving the relation of principal and
agent.    In the former class it seems that no settle-
ment, however carefully and solemnly made, interposes
any difficulty to re-openiug the account and making
the settlement anew; but no case has gone so far in
the other class of cases.    In the well-considered case
of *Lewes* v. *Morgan*, Chief Baron Macdonald states
what may be regarded as the reasons for the distinc-
tion in these words: "An attorney has often been
described to be an officer of the court, and in that

character, responsible for the protection of his client
from all acts which may prove detrimental to his in-
terest.    It is his duty to apprise him of the legal
consequences of his actions, and he ought to be able
to lay before the court, when called upon, a ready
account of all their mutual transactions and to be able
to corroborate them by evidence." 4 Price Exch.
Rep., 42.    No such duties and responsibilities as those
specially mentioned in the above extract, are imposed
on agents who do not also combine in themselves the
character of attorney.    It has been, moreover, dis-
tinctly held, and we think the ruling accords with
reason and the weight of authority, that the principle
of law, which courts of equity apply to settlements
between attorney and client, does not apply or extend
to settlements between principal and agent. *Philips* v.
*Belden,* 2 Edwards' Ch. R., 16; and as a consequence,
the plea of stated and settled account has the same
conclusive force and effect in case of settlements be-
tween principal and agent as between persons not be-
longing to any of the confidential relations.

10.    As closely connected with, and in some sort
arising out of the exercise of the store privilege, the
company claims that Raht made contracts for labor,
transportation and materials, to be paid for in part in
goods, provisions and other property, at exhorbitant
profits and prices, and thereby increased the wages of
labor, and the prices of hauling and materials, inflict-
ing on it great damage and loss.    This claim rests
upon the allegations that an immense amount of labor,
hauling and materials was required to carry on the

company's mining, smelting and refining operations; that Raht refused to make contracts for labor, hauling and materials unless the workmen and contractors would agree to take in part payment goods, supplies and other property, at exorbitant prices and profits; that they submitted to these harsh terms aud exactions, in consideration of an increase in prices and wages, and that Raht did, in consequence thereof, pay higher wages for labor, and larger prices for hauling and materials.    Raht admits that frequent sales of property were made at remunerative prices, with now and then advances in money, to be paid partly in labor and materials, but denies that such sales and advances were injurious to the company.    He insists that they were highly beneficial, for thereby he was enabled to break up and destroy combinations to enhance wages and prices, and ultimately to reduce them by enlarging the number of employees and contractors. He also denies that any agreement was ever made to increase, in consideration of these sales and advances, or the profits thereof, either the wages of labor or the cost of materials, or that the same resulted, in a single instance, in any such increase.    He insists, further, that the sales and advances were made with the full knowledge and consent of the board of directors, having entered into an agreement with the board to that effect;    that the monthly statements showed the labor performed and the materials furnished, with the exact amount of wages and prices expended for each;    that numerous settlements were made, with this full knowledge on the part of the

board, based upon the accuracy and completeness of
those statements; and the plea of stated and settled
account is also interposed to this claim of the com-
pany.

The parties have taken a large mass of proof, bear-
ing more or less directly upon the points in dispute,
and we have gone far enough into it to be convinced
that both sides have succeeded admirably well in prov-
ing their own views of the case. The matters, bear-
ing upon the issues, are just of such a character that
men of known intelligence and integrity, residing in
the same community, may honestly entertain and ex-
press different and conflicting opinions. If the decis-
ion of the court depended alone upon the questions
of fact, we would be compelled to undergo the labor
of a critical analysis, and careful weighing of the
proof, for it seems, from a general view of it, to pro-
duce a kind of equipoise between the probable injuries
and probable benefits resulting to the company from
Raht's plans and his practical execution of them. It
is certainly proved that he made numerous sales of
goods, wagons, teams and other property, to be partly
paid for in labor. hauling and materials; but it does
not appear, in a single instance, that higher wages or
larger prices were, in fact, paid, or agreed to be paid
in consequence of such sales and purchases. It is no
doubt true that he realized on the advances of money
and sales of property remunerative interest and profits;
but the danger of damage and loss from the wear
and tear and destruction of the property, and from
the bad faith and insolvency of the purchasers, was

borne and endured by him alone, the company having no part or share in the risk.    It is equally true that he sold goods and supplies to employees, contractors and other customers at higher prices than other merchants in Ducktown; but there is proof tending to show that his goods and supplies were of a better quality and intrinsically worth more to the buyer and consumer, and, beyond question, no discrimination in prices was made between the general population of Ducktown and the contractors and laborers in the mines and works.    Whatever may have been his rate of interest on advances of money, or his profits on the sale of property, it is positively certain the company did not, directly or indirectly, pay any part of them, nor incur any loss in consequence of the sales or advances.

It seems to be conceded that these sales of wagons, teams and other property, and the advances of money, enabled Raht to break up strong and threatening combinations to enhance wages and prices, to bring into competition a larger number of employees and contractors, and to prevent any increase for the time, and, in the end, to produce a gradual decrease in the prices for hauling and materials.    Now, the wisdom and necessity of his plans are not questioned in the argument of the company's counsel, but complaint is alone made against the manner and mode of his carrying the plans into execution.    If we correctly understand the argument, it assumes that the company furnished him with ample funds to carry on its whole mining operations, and that if these funds had been invested

in the purchase of wagons, teams and other property at fair and reasonable prices, and the property thus bought had been sold and turned over to employees and contractors at cost price, the beneficial result to the company would be merely a question of mathematical calculation.

There are several conclusive answers to this position. As matter of fact, the company did not furnish him with ample funds for this or any other purpose connected with its business operations. The very necessity for his making sales of wagons, teams and other property, to be in part paid for in labor, hauling and materials, arose, as will clearly be shown in another part of this opinion, from the failure of the company to pay him a large debt, according to its express and positive agreement. Adopt, however, the broadest and most liberal construction of the terms of the general agency, and no such investment of the company's money can be implied from the authority vested in the agent. It is, in truth, wholly improbable that any board of directors could have been induced to sanction afterwards, much less direct in the first instance, any such investments, with the hope of making or saving anything in the transaction.

There is no doubt but that Raht declined, in many instances, to give contracts to persons who proposed to do hauling or furnish supplies at something less than the usual ruling price, if they were paid all in money and at short intervals. It is conceded, and the weight of proof establishes the fact, that the regular prices paid, and uniformly approved by the board

Raht *v.* Mining Company.

of directors, were nothing more than reasonable and just, yielding barely a decent living to the parties. Reductions, below what is reasonable and just, may confer temporary benefits, but they will ordinarily drive competitors out of the field, and run up in the end prices beyond what they were at the start. Establishments so large and expensive as that of the company's mines and works, cannot stop or stand still for a day without serious damage and loss. Such an establishment, situated in a mountainous and comparatively isolated locality, and dependent for its successful operation upon a great diversity of labor and variety of supplies, cannot pay less than fair, just and reasonable wages and prices, and that, too, with uniform regularity, without running imminent risk of such damage and loss from time to time for want of labor and supplies. It would seem that the wisdom and good sense of Raht's policy and course in this particular were fully vindicated by the reduction in the price of hauling, charcoal, cord-wood, and perhaps other articles, during the latter years of his agency, and more especially by the utter failure of his successor to permanently reduce either the wages of labor or the prices of supplies and materials below their fair, just and reasonable value.

We are very much inclined to the opinion that the company was not injured, but positively benefitted in the end, by the transactions now complained of. It, however, satisfactorily appears that these transactions, outside of the sales in the store, occurred chiefly, if not entirely, after the making of the new contract for

the sales agency in the year 1869. The board of directors had, by resolution, adopted on the 20th day of May, 1868, agreed to pay fifty thousand dollars of the company's indebtedness to Raht on the 1st of August, 1868, and the balance of it, without specifying the amount, on the 1st of December in the same year. When the new contract for the sales agency was entered into on the 21st of January, 1869, Raht was expressly authorized, in consequence of the company's failure to make these payments, to pay employees and contractors in such way or manner as they might agree to be best. We do not undertake to give the exact language of the clause, but its substance and import. Anticipating, no doubt, the use that would be made of the clause, the company attempts to get clear of it by alleging that it was a covert attempt on the part of Raht to obtain its indirect approval of his previous and subsequent fraudulent dealings, and that the purpose and scope of the clause were not explained to its board of directors.

We cannot, for these reasons, decline to place on the clause its true and proper meaning, or refuse to give full force and effect to it as a valid, binding contract. We have seen that if parties will enter even into hard and unconscionable bargains with their eyes open, courts of equity cannot and will not relieve them, unless they show fraud or some undue means used. Nothing like fraud or undue means, in the sense of the principle, are alleged or proved. We cannot very well see how intelligent business men,

knowing the condition of things at the mines, and the directors are presumed to have such knowledge, could fail to understand the purpose and scope of the clause. Beyond question, it clothed Raht with the right and power to contract for labor, hauling and materials for the mines and works, and to pay for them in property and money, as he and the employees and contractors might agree upon. The proviso to the effect that the arrangement should not be carried out in such way as to increase the price of labor, hauling or supplies above what was paid the preceding year, adds great strength and force to the construction above given. No just ground of complaint against the sales of property to be paid for in labor, hauling or supplies, could exist under the clause, unless the sales had the effect to increase the prices above what were paid during the year 1868. And it is not insisted, and cannot be, under the proof that the sales produced any such increase in any instance. The directors were fully informed of the construction which Raht placed on the clause, for he called their special attention to the facts that his payments to employees and contractors were not always in money, but frequently in property at remunerative prices, and that the privilege of keeping the store, and the right to make contracts, partly payable in property, were liable to abuse, and urged them to watch and guard, as he had done, that the exercise of the privilege and right did not work any injury to the company. We hardly deem it necessary to add that the plea of stated and settled account has, if anything, greater force and more con-

clusive effect in its application to this branch of the case than to any other.

11. There are several other matters of more or less importance which deserve at least a brief consideration. As a means of attacking the accuracy of the monthly statements, but not as a distinct ground of relief, it is urged in argument that Raht adopted and used in the measurement of charcoal the "struck" instead of the "heaped" bushel, the former containing only 2150, while the latter contains 2700 cubic inches, making a difference of near one-fifth in the bushel. It is also said that the directors, thinking the heaped bushel was used and referred to in the monthly statements, made no objection to the price reported as paid per bushel for coal. If they were deceived and misled, as argued, the company would not be entitled to any relief in the present suit, for want of proper allegations in the pleadings; but they were not deceived or misled in the matter. The proof shows that the "struck" bushel was exclusively and solely used in the measurement of charcoal by the old companies before the formation of the new one, was adopted and used under the general agency of Mr. Congdon, and was simply continued in use after Raht became general agent. We think from these facts and others equally as pointed, that the directors, or some of them at least, must have known the kind of bushel used and referred to in the monthly statements, and were not deceived and misled in approving the agent's accounts and making settlements with him in this respect.

Strong accusations of fraud, overreaching and un-

Raht v. Mining Company.

conscionable bargains are made against Raht, predicated upon the sale of some standing timber and of some cord wood cut on lands belonging to him.    Great prominence is given to these charges in the cross-bill, but they seem to be, virtually, if not altogether, abandoned in argument.    We do not think the company has any just ground of complaint on account of these transactions.    The proof does not show any acts of fraud or overreaching, nor that the prices agreed to be paid were exorbitant, but on the contrary were reasonable and just.    There is no ground whatever for setting aside the sales, or re-opening the settlements made subsequent to the date of the transactions.

It is alleged in the cross-bill with great particularity, but seems to be ignored altogether in the argument, that Raht converted a large quantity of wood-ashes by hauling them upon and enriching his own lands instead of selling or having them scattered on the lands of the company.    The proof makes it quite clear that the ashes could not be sold at any price and were not worth more, if really so much, as the cost of removing them, and it follows that the company was benefitted by having them taken out of the way without incurring any expense for their removal.

Serious complaints are also made in the cross-bill, upon the grounds that Raht invested large amounts of the company's money in lands during the civil war, and at its close paid back the same in worthless Confederate notes and Southern bank notes of but little value, and that he claimed and collected at the same time from the company a false and fraudulent

debt, amounting to fifty-seven thousand dollars. There is not a scintilla of proof in the record to establish either one of these gross charges. On the contrary, the minutes of the board of directors show that a full, fair and satisfactory settlement was made with Raht in February, 1864, and a balance of some thirty thousand dollars, due to him and some employees, was paid in refined copper at high prices. It also appears that treasurer Cameron, not the agent Raht, received the proceeds of the sales of the company's ores and copper during the war, excepting some small sums for current expenses, and that he turned over on settlement after the close of the war, to the board of directors the sum of $372,431.02, in Confederate notes and certificates of indebtedness. Treasurer Cameron and agent Raht were neither idle nor unfaithful to their official duties and trusts during the war. The board of directors in the annual report for the year 1866, became the loud trumpeter of their activity, fidelity and good faith. It congratulates the stockholders that the company had, upon the return of peace, completed the refining works, undertaken in conjunction with two other companies; had finished the new smelting works on its Isabella property; had paid off a debt of eighty thousand dollars due before the war to its treasurer; had secured a one-third interest in the united refining works; had obtained good and collectable claims for some thirty-nine thousand dollars; had released its property from a lien for an equal amount, and had on hand at the mines more than enough of refined copper to extinguish its

Raht *v.* Mining Company.

whole indebtedness to its agent, officers and employees. This summing up shows wonderful success in operating so extensive and complicated an enterprise during the period of a fierce civil war, and no doubt the success is in the main attributable to the indomitable energy and activity and strict fidelity and good faith of the general agent and superintendent.

We think, upon a careful and deliberate review and consideration of the whole case, that the decree of the chancery court, dismissing the cross-bill of the company and granting the relief prayed for in the original bill, is correct, but we do not concur in opinion with the learned chancellor on the subject of costs. The general rule on the subject of costs, adopted in the court of chancery, is the same as in a court of law, that the costs follow the result of the suit; but the former court may under certain circumstances excuse the unsuccessful party from the payment of costs to his opponent, and even in exceptional cases actually throw his own costs upon the party succeeding. Cases of the latter class, however, are very limited, and seem to be confined to cases where the unsuccessful party is in no fault whatever. 2 Daniel's Ch. Pl. and Pr., 4 Am. ed., top page 1381, and notes. We are unable to see any sufficient reason or circumstance to take the present case out of the general rule. It may be true that a demurrer to the cross-bill would have dispensed with the necessity of taking proof upon many of the issues imperfectly and insufficiently stated, but the intrinsic difficulty of making a demurrer, standing alone or combined with an answer, a full, satisfactory and complete defense,

where general allegations of mistake, fraud and uncon-
scionable advantage are interwoven with the whole
texture of the adverse pleading, may well excuse, not
to say positively deter, parties acting under the advice
and direction of learned counsel, from resorting to it.
It is further laid down as a settled rule in courts of
equity, that a party introducing unfounded charges of
fraud, will be made to pay the costs occasioned thereby,
though he may be successful in the suit, or the other
party may have acted in such a manner as to give
reasonable grounds of suspicion. 2 Daniel's Ch. Pl.
and Pr., 4 Am. ed., top page 1399, and cases cited
in the notes.

In view of the charges in the cross-bill and the
failure of the company to make out a case for relief
under any one of these charges, we think it is highly
reasonable, just and proper to adhere to the general
rule in the disposition of costs. A decree will be
entered in conformity with this opinion, dismissing the
cross-bill of the company and giving the relief sought
in the original bill, with a reference to the clerk of
this court to ascertain the amount due to complainant
Raht, and in taking this account, the company will
be charged and credited as directed by the decree in
the chancery court. Upon the ascertainment of the
amount due, complainant Raht will be entitled to a
decree for the same against the company and the
sureties on the replevy-bond, and to enforce the lien
created by the resolutions of the board of directors,
of the 1st December, 1874, upon the personal property
of the company. The company will pay the costs in
the chancery court and the costs in this court.